IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 15-cv-00192-RBJ

TAWNY HIATT,

      Plaintiff,

v.

COLORADO SEMINARY, a Colorado Nonprofit Corporation,
ALAN KENT, and
JACARANDA PALMATEER,

      Defendants.

---

## ORDER

---

This matter is before the Court on defendants' motion for summary judgment [ECF No. 33] and defendants' motion to strike affidavit statements [ECF No. 41].  For the reasons stated below, the motion for summary judgment is granted, and the motion to strike is denied as moot.

## BACKGROUND

This case arises out of plaintiff Tawny Hiatt's employment as a psychologist.  She believes she was "harassed, demoted, and ultimately constructively terminated from her employment in violation of state and federal law."  ECF No. 5 at 1.  Hiatt names three defendants: Colorado Seminary (operating as the University of Denver, hereinafter "DU"), Alan Kent, and Jacaranda Palmateer (collectively "defendants").  *Id.*  The following facts are undisputed except where otherwise noted.

In 2011 DU hired Hiatt as Staff Psychologist and Training Director for the Health and Counseling Center (HCC).  ECF No. 33 at ¶ 1.  The HCC offers "wellness services, including medical and counseling services, to DU's student body."  ECF No. 5 at ¶ 14.  Kent and Palmateer supervised Hiatt.  ECF No. 33 at ¶ 3.  In her role as Training Director, Hiatt supervised graduate student interns and post-doctoral fellows in individual and group settings. *Id.* at ¶ 4.  In addition to her role at DU, Hiatt maintained a private practice which DU permitted as "long as her job at DU was her first priority."  *Id.* at ¶ 5.

Hiatt "views herself as someone who does not 'present as a stereotypical feminine woman' and someone who exhibits 'what people stereotype as masculine behaviors: being direct, confronting things directly, highly confident, that sort of thing.'"  *Id.* at ¶ 2.  For the entirety of her time at DU, Hiatt has presented herself this way, and "it has always been common knowledge that she had romantic relationships with women."  *Id.*

One intern, Emily Fogle, requested that Hiatt supervise her in her post-doctoral (post-doc) year.  *Id.* at ¶ 4.  After Fogle graduated, she recommended that Abby Coven, her former classmate and friend, use Hiatt as a supervisor during her own post-doctoral time.  *Id.* at ¶ 6; ECF No. 36 at ¶ 3.

In September 2012 Coven hired Hiatt as a supervisor.  *Id.*  Hiatt supervised Coven at Hiatt's private practice after HCC hours, and Coven had no DU association during this time. ECF No. 36 at ¶ 4.  Around December 2012 Coven and Hiatt "developed romantic feelings for each other."  ECF No. 33 at ¶ 7.  Hiatt inquired with a former colleague about how she should handle her changing relationship with Coven.  ECF No. 36 at ¶ 8.  According to plaintiff, they stopped working together in a supervisory capacity on January 3, 2013 and subsequently began a

romantic relationship. *Id.* Defendants agree that the supervision ended sometime in January 2013. ECF No. 33 at ¶ 7. Coven then hired a different supervisor. ECF No. 36 at ¶ 8. Around this time, Kent and Palmateer promoted Hiatt to Assistant Director of Counseling/Training Director. ECF Nos. 36 at ¶ 6; 33 at ¶ 3. Hiatt attests that neither had concerns about her performance, but that she received less money than her male predecessor in that role. ECF No. 36 at ¶ 6.

In January 2013 Hiatt was conducting individual supervisions of Fogle who was a post-doc at HCC and Dave Shanley and Christine DeVore who were interns. *Id.* at ¶ 7. Additionally, she was co-leading group supervision of a group of interns, including Shanley, DeVore, Kim Mathewson, and Alexis Wilbert. *Id.* Palmateer served as her co-leader. *Id.* Hiatt was also "supervising four graduate students." *Id.*

The parties disagree over how supervisees interpreted Hiatt's interpersonal style and method of supervision. Defendants allege that during supervision, Hiatt would use direct techniques, which sometimes resulted in supervisees breaking down, and the supervisees referred to this experience as "being Tawny'ed." ECF No. 33 at ¶ 15. Defendants also claim that Hiatt would "practice therapy" on her supervisees and "would openly discuss and comment on their romantic relationships, familial relationships, and past traumatic experiences." *Id.* Plaintiff claims that her style is "very valid," and that she never commented on a trainee's personal relationships or traumatic pasts. ECF No. 36 at ¶ 2. Hiatt describes that her supervisees "would affectionately joke that they had been 'Tawny'ed'" after "impactful meeting[s]." *Id.* Hiatt attests that her interns gave her positive ratings until she began dating Coven. *Id.* at ¶ 5.

Defendants contend that "Hiatt knew the supervisees might react negatively to the news of her relationship with Coven." ECF No. 33 at ¶ 10.

Fogle was upset when she learned from Coven that Coven and Hiatt were pursuing a romantic relationship, and that Hiatt was no longer supervising Coven. ECF No. 33 at ¶ 8. Coven had requested that Fogle not tell many people about the situation. *Id.* Hiatt decided to discuss the relationship with Palmateer once "she learned that Fogle was upset about the situation." *Id.* at ¶ 9. When Fogle had initially requested Hiatt as her supervisor, she knew that Hiatt was a lesbian with a female partner. *Id.* at ¶ 4. Fogle attests that "she was asked to 'lie' about the relationship," and that she had observed text messages demonstrating that Hiatt's behavior was "inappropriate." ECF No. 36 at ¶ 12. Hiatt contests that any such text messages exist. *Id.* Hiatt claims that she approached Fogle and offered to end their supervisory relationship, and that Fogle declined. *Id.* at ¶ 13.

Fogle believed that Hiatt had violated two rules from the American Psychological Association's (APA) Code of Conduct. ECF No. 33 at ¶ 11. Rule 3.05 "prohibits a psychologist from being in a professional role with one person while simultaneously being in a relationship with someone closely associated with the person with whom the psychologist has a professional role." *Id.* Additionally, Rule 7.07 forbids psychologists from having sexual relationships with supervisees. *Id.* Hiatt argues that she did not break any rules because there is no "prohibition against a psychologist dating a former supervisee." ECF No. 36 at ¶ 9. She notes that this is "reiterated" in DU's Graduate School of Professional Psychology (GSPP) textbook. *Id.*

Kent sought guidance from the APA's ethics office and two experts at DU—his supervisor Patti Helton and the dean of GSPP Shelly Smith-Acuna—in determining whether

4

Hiatt's relationship with Coven raised any ethical issues.  ECF No. 33 at ¶ 13.  Following these consultations, Kent concluded "Hiatt's conduct was in an ethical grey area, but it also determined a serious lack of judgment given her position as a role model for the trainees."  *Id.*  Hiatt maintains that Kent did not contact Coven "or investigate the timing of the relationship."  ECF No. 36 at ¶ 15.  Hiatt claims that Helton suggested that Hiatt "should be required to go to therapy."  *Id.*

On February 18, 2013 Hiatt emailed Palmateer to apologize for the impact she was having, and she offered to "do any and everything to engage in damage control and do what is right for HCC."  ECF No. 33 at ¶ 14.  The next day Hiatt met with Kent, Palmateer, and the five trainees.  *Id.* at ¶ 16.  Hiatt claims that she apologized and "explained how her supervision of Coven was different from that of an intern."  ECF No. 36 at ¶ 16.  Plaintiff alleges that, during the meeting, Fogle accused her of lying about when the relationship began "and claimed to have seen text messages" that confirmed that Coven and Hiatt began dating during the supervisory relationship.  *Id.*

Defendants claim that four of the five interns opted to no longer be supervised by Hiatt. ECF No. 33 at ¶ 16.  Hiatt agrees that Fogle, Mathewson, and Shanley decided not to be supervised by her any longer, but she indicates that Wilbert and DeVore wanted to continue doing supervisions with her.  ECF No. 36 at ¶ 17.  She also notes that her graduate students desired to continue their supervisory relationship with her.  *Id.*

Palmateer also recommended that Hiatt contact the GSPP consortium director, Jenny Cornish, to tell her what happened with the trainees.  ECF No. 33 at ¶ 17.  Hiatt recognizes that Palmateer wanted her to have the opportunity to "tell her own version of the story."  *Id.*  Hiatt

thought that Cornish should know about the "situation because she was training director for the internship consortium." *Id.*

On February 21 2013 Hiatt sent another email to Palmateer stating, "I recognize that this has become a problem for HCC and that I could have done things differently to perhaps mitigate the impact on HCC – and I am sorry for that." *Id.* at ¶ 18.  Defendants allege that Hiatt began to blame the interns for "overreacting due to their own traumatic experiences and pathologies," and that she became "defensive whenever she was faced with criticism of her actions and decisions." *Id.* at ¶ 19.

On February 22, 2013 Hiatt met with Kent and Palmateer to discuss moving forward.  *Id.* at ¶ 22.  Kent explained his concerns with Hiatt's continuing to serve as Training Director because the role demands "exemplary ethics, boundaries, and professionalism."  He also discussed the fact that she "had not taken any ownership" and had "chosen to blame the interns for their reactions." *Id.*  Kent also commented that it was impractical for her to continue as Training Director as most of the trainees no longer desired to be supervised by her.  *Id.*  During this conversation, Kent and Palmateer offered Hiatt a number of options, including resigning voluntarily or taking a new role as a "Staff Psychologist/Outreach Coordinator."  Hiatt claims that Kent and Palmateer "told" her that she could "(1) resign, (2) be demoted and undergo six months of counseling regarding her supervisory style with Asher before supervising again, or (3) remain in her position and allow the matter to be 'taken up by HR,' in which case other details 'may come out.'"  ECF No. 36 at ¶ 21.  She also alleges that Kent said she "could not supervise because she was immature and lacked the insight or ability to practice from interpersonal supervision," but that she could continue treating clients.  *Id.*  On February 27, 2013 Hiatt's

attorney sent a letter to DU.  *Id.* at ¶ 24.  Hiatt claims that the letter attested that she had

experienced "sexual orientation discrimination," but that DU did not conduct an investigation.

ECF No. 36 at ¶ 22.

On March 4, 2013 Hiatt accepted the position as Staff Psychologist/Outreach

Coordinator, but defendants allege that she was upset about it and "threw" the acceptance

paperwork on the desk and "stormed out."  ECF No. 33 at ¶ 25.  Plaintiff disputes this.  ECF No.

36 at ¶ 23.  The position of Staff Psychologist/Outreach Director did not "involve supervision,"

and it required Hiatt to work with "an outside consultant to address her supervisory issues."  ECF

No. 33 at ¶ 22.  Defendants maintain that the salary was previously set at and budgeted for

$58,000, which was $2,000 less than Hiatt was previously making; however, $58,000 was "the

highest pay of any of the staff psychologists."  *Id.* at ¶ 23.  Hiatt claims that, after she took the

job, she received a reduction in salary from $60,000 to $58,000 even though the position was

budgeted for the higher amount.  ECF No. 36 at ¶ 25.

On March 6, 2013 Hiatt brought Coven to the office, and Coven's presence upset Fogle.

*Id.* at ¶ 26.  Hiatt claims that Fogle never saw Coven during her brief visit, and Fogle "falsely

reported to Kent that she was forced to interact with Coven[.]"  ECF No. 36 at ¶ 24.  In response

to Coven's visit, Kent told Hiatt that "her actions raised 'further concern about [her] judgment

and [her] apparent lack of understanding about [her] contribution to the situation.'"  ECF No. 33

at ¶ 26.

Kent and Palmateer allege that they asked Hiatt for input on how to relay the information

about her reassignment "to personnel with a need to know."  *Id.* at ¶ 27.  They also claim that

they "instructed the trainees to refrain from spreading information about her relationship and

7

reassignment." *Id.*  Hiatt claims that DU "compelled" her to disclose the reason for her demotion

to Cornish and two other DU employees, and that Hiatt learned that the news "spread throughout

the GSPP." ECF No. 36 at ¶ 26.  Hiatt also alleges that she told a new HCC employee because

"Palmateer had invited [the employee] to ask other staff why Hiatt" had changed roles. *Id.*  Hiatt

maintains that, with the exception of Cornish, none of these individuals needed to know. *Id.*

In June 2013 Hiatt notified Palmateer that Mathewson had mentioned her relationship to

a training director candidate.  ECF No. 33 at ¶ 29.  Palmateer subsequently is alleged to have

"disciplined" Mathewson.  *Id.*  Hiatt's supervision of Mathewson had ended in December 2012.

ECF No. 36 at ¶ 5.  Hiatt claims that Mathewson told a number of people that "Hiatt was

demoted because she had a relationship with a supervisee," which "was damaging to Hiatt's

reputation." *Id.* at ¶ 29.

Per the terms of her agreement to the new role, Hiatt did meet with an outside consultant,

Shirley Asher, from March through June 2013 either weekly or biweekly.  ECF No. 33 at ¶ 30.

Shirley gave Kent and Palmateer a report, "explaining that Hiatt felt that she misjudged the

fragility and pathology of the interns." *Id.*  Hiatt claims that Asher "was not permitted to speak

to any of the trainees," and that Kent refused to allow Hiatt to supervise so that Asher could

observe her in action.  ECF No. 36 at ¶ 32.  Hiatt claims that Asher concluded that she was fit to

supervise, but that defendants did not permit her to do so because "she had become tearful during

a conversation with an intern," and her approach was "not a good fit." *Id.*  Hiatt also attests that

Asher told Kent and Palmateer that they had not contained the situation well. *Id.* at ¶ 33.

In August 2013 Kent and Palmateer told Hiatt that they were not ready for her to resume

any supervision.  ECF No. 33 at ¶ 31.  In support of their stance, they noted "her continued focus

on trainees' pathology rather than her own behavior; her emotionally intrusive supervision style in which she intentionally breaks down and 'rescues' the trainees; reports that she bad-mouths other supervisors; and continuing questions about her boundaries, maturity, and self-awareness." *Id*. Hiatt disagreed with their decision. *Id.*

Sometime that summer, in either July or August, Hiatt claims that she only received a small raise because Palmateer gave her a "low performance evaluation." ECF No. 36 at ¶ 34. In November, Hiatt filed a grievance through DU's Office of Equal Opportunity. ECF Nos. 33 at ¶ 32. DU responded to the grievance and investigated it. *Id*. Hiatt claims that Kent and Palmateer made negative statements about her in response to the grievance. ECF No. 36 at ¶ 36.

Hiatt took a three-month leave of absence from November 2013 to February 2014 for medical reasons, which she related to workplace stress. ECF No. 33 at ¶ 34. The work environment caused her "emotional trauma and posed a threat of continuing serious emotional injury." ECF No. 36 at ¶ 42. Her physical, emotional, and mental symptoms "improved only" while she was on medical leave. *Id.* She also notes that Palmateer "observed a decline" in her health before her leave. *Id.* During this time, she only saw private practice patients. ECF No. 33 at ¶ 34. In December 2013 Hiatt filed a charge with the U.S. Equal Employment Opportunity Commission (EEOC). ECF No. 36 at ¶ 43.

After Hiatt's medical leave, she requested and DU provided a number of accommodations, including more time to complete her notes and intake documentation; relief from covering night-time calls; and time off to go to a weekly medical appointment. ECF No. 33 at ¶ 37. Defendants claim that she frequently missed work "for reasons unrelated to her medical issue." *Id.* at ¶ 38. Hiatt attests that she also requested an accommodation to work no more than

eight hours a day at DU.  ECF No. 36 at ¶ 44.  She claims that she was treated differently than other clinical staff because after her return she had to provide a doctor's note to take "non-FMLA sick time, get permission before blocking her schedule, and make up clinical time that she missed[.]"  *Id.* at ¶ 47.

In her role as Outreach Coordinator, Hiatt was required to perform between 22 and 24 hours of clinical work per week.  This could be prorated if she took sick leave or vacation time.  ECF No. 33 at ¶ 36.  Hiatt claims that in February 2014, Palmateer increased her clinical hourly requirement from 22 to 24 hours.  ECF No. 36 at ¶ 47.  Defendants maintain that "Hiatt was never demoted, fired, or even given a pay cut even though she rarely met her 24 hour clinical requirement."  ECF No. 33 at ¶ 38.  DU provided her 72 hours of additional time to do her clinical notes, but she could not complete them during this time.  *Id.* at ¶ 39.

Around April 24, 2014 Kent and Palmateer met with Hiatt for "an interactive process meeting," during which they told Hiatt that they were not telling others about her personal life or employment accommodations.  *Id.* at ¶ 40.  Kent did tell her "if she was concerned about her privacy, she might not want to tell everyone she was suing the university."  *Id.*  Hiatt claims that, during this meeting, Kent and Palmateer criticized her for "absenteeism and late case notes."  ECF No. 36 at ¶ 49.  Palmateer later sent her an email to clarify the expectations for her job and "summarizing her accommodations."  ECF No. 33 at ¶ 40.  Hiatt claims that in April and May 2014, Kent conducted a few "drive bys" of Hiatt's private office because of his suspicion that she was there when she should be at DU.  ECF No. 36 at ¶ 50.  Kent alleges that he was driving by en route to his dog's day care.  *Id.*

On May 30, 2014 Hiatt sent a resignation letter to DU, and she said she would resign on June 27.  ECF No. 33 at ¶ 41.  Her letter also "complained of retaliation."  ECF No. 36 at ¶ 51.  DU replaced her with a younger male.  *Id.* at ¶ 52.

Plaintiff filed this suit on January 28, 2015, bringing federal and state law claims.  She amended her complaint on February 2, 2015.  ECF No. 5.  She brings the following claims against DU: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.* (Title VII); (2) retaliation against her for engaging in protected activity in violation of Title VII; (3) sex discrimination in violation of Title IX of the Education Amendments of 1972, as amended 20 U.S.C. § 1681 *et seq.* (Title IX); (4) retaliation against her for engaging in protected activity in violation of Title IX; (5) wrongful discharge in violation of public policy; and (6) constructive termination in violation of C.R.S. § 24–34–402.5.  Additionally, plaintiff brings a claim for tortious interference with contract against individual defendants Kent and Palmateer.  Finally, Hiatt asserts claims of invasion of privacy, outrageous conduct, and intentional infliction of emotional distress against all three defendants.  *See* ECF No. 5.

## ANALYSIS

### I.      Standard of Review

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (internal quotations and citations omitted).  A material fact is genuine if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

## ANALYSIS

**II.    Defendants' Motion for Summary Judgment.**

Defendants move for summary judgment on all of Hiatt's claims. *See* ECF No. 33. The Court will address each in turn.

### a.    Claims One and Three – Sex Discrimination in Violation of Title VII and Title IX.

Under Title VII, it is unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title IX provides that "[n]o person . . . shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."[1] *Khalik v. United Air Lines,* 671 F.3d 1188, 1192 (10th Cir. 2012).

---

[1] The same analytic framework governs a Title IX discrimination claim. *See Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001).

Under the *McDonnell Douglas* analysis, the plaintiff must first prove a prima facie case of discrimination. *Id.* To do so, "a plaintiff must establish that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class." *Id.* (internal citation omitted). If the plaintiff satisfies the prima facie test, the employer must "produce a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the employer does so, "the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Id.*

Hiatt claims that DU discriminated against her because of her sexual orientation, her sex, or because she fails to conform to "gender norms." *See* ECF No. 36 at 11. She alleges that DU discriminated against her by:

> subjecting her to sufficiently severe or pervasive harassment based on her sex and failure to conform to stereotypical gender roles so as to alter the conditions and terms of her employment; condoning or tolerating such harassment; subjecting [her] to less favorable terms and conditions of employment including, but not limited to, terminating her supervision responsibilities, requiring that she disclose the circumstances around her demotion to other HCC employees, and scrutinizing her work more than other employees; and constructively terminating [her].

ECF No. 5 at ¶ 196. She also alleges that "DU was motivated to discriminate against [her] in part, by its attitudes about stereotypical gender roles in relationships, including [her] failure to adhere to the sexual stereotype that having relationships with men is an essential part of being a woman." *Id.* Additionally, Hiatt claims that individuals reacted poorly to her relationship with Coven "because they were homophobic" and because she was "violating gender norms." ECF No. 36 at ¶ 20. She further notes that she made less money than her male predecessor as

Assistant Director of Counseling/Training Director.  *Id.* at ¶ 6.  Finally, Hiatt alleges that defendants' "abrupt change in treatment" of her "after February 2013 and their continued hostility thereafter was motivated by discriminatory animus."  *Id.* at 12.

Defendants argue that Hiatt cannot establish the prima facie case of sex discrimination because she fails to state a protected status under Title VII, and even if she did, she fails to show that DU treated similarly-situated individuals more favorably.  ECF No. 33 at 9–11.

Regarding protected status, defendants are correct in noting that the Tenth Circuit has not yet recognized sexual orientation as a basis for a Title VII discrimination claim.  *See Etsitty v. Utah Transit Authority*, 502 F.3d 1215, 1222 (10th Cir. 2007).  However, in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250 (1989), the Supreme Court held that a woman who did not conform to mainstream expectations of female looks and behavior had a claim under Title VII by interpreting the statute's explicit prohibition of sex discrimination to include the biological differences between men and women *and* gender stereotyping.  In *Etsitty*, the Tenth Circuit assumed that a claim existed where the plaintiff—a pre-operative male-to-female transsexual— alleged that she did not conform to male stereotypes before holding that the plaintiff could not prevail because the employer presented a legitimate, nondiscriminatory reason for its employment decision.  502 F.3d at 1224.  Notably, the *Etsitty* panel did not recognize transsexuals as a protected class, so the plaintiff's claim proceeded as a sex discrimination claim. *Id.*  However, the Circuit has not clarified whether an employer's discrimination based on an employee's failure to conform to gender stereotypes will always support a Title VII claim based on sex.  *See Deneffe v. Skywest*, Inc., 2015 WL 2265373, at *5 (D. Colo. 2015).

For the purposes of the present motion, the Court will assume that a gender stereotyping claim is available to Hiatt. However, on either theory—discrimination based on sex or on gender stereotypes—Hiatt's claim fails because she has not satisfied the prima facie test for discrimination. Even if the Court were to assume that she suffered an adverse impact when she accepted the reassignment to Outreach Director or alternatively that she was constructively discharged,[2] Hiatt fails to offer evidence from which a reasonable jury could conclude that defendants treated her less favorably than similarly-situated individuals not in the protected class.

The final prong of the prima facie case for Title VII discrimination requires Hiatt to offer evidence that DU treated her less favorably than it did other similarly-situated employees. *Argo,* 452 F.3d at 1201. Hiatt is required to identify similarly-situated employees by going beyond her allegations in her pleadings and providing "specific facts showing there is a genuine issue for trial." *Celotex,* 477 U.S. at 324. In carrying this burden, Hiatt must produce affidavits or other competent evidence. *Concrete Works of Colorado, Inc. v City and County of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994). She must demonstrate that she was similarly situated to other employees in "all relevant respects." *McGowan v. City of Eufala,* 472 F.3d 736, 745 (10th Cir. 2006) (internal citation omitted). In general, "[s]imilarly situated employees are those who deal

---

[2] The Tenth Circuit has "liberally define[d] the phrase 'adverse employment action,'" and takes "a case-by-case approach, examining the unique factors relevant to the situation at hand." *E.E.O.C. v. C.R. England, Inc.,* 644 F.3d 1028, 1040 (10th Cir. 2011) (internal citations omitted). "In general, only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." *Id.* But under certain circumstances, the Tenth Circuit has not constrained the term "adverse employment action" to "such acts. *Id.*

with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Id.* (internal citation omitted).

Defendants argue that Hiatt "is unable to identify a comparator who was treated more favorably under similar circumstances." ECF No. 33 at 11. Hiatt attests that "Mathewson and Fogle are appropriate comparators to Hiatt because they all shared the same supervisor, Palmateer, and were subject to the same ethical and professional rules[.]" ECF No. 36 at 13. In support of her claim, Hiatt cites the GSPP internship training handbook, which states that "[t]he Internship Consortium adheres to the APA Ethical Standards as well as all relevant local and national laws." ECF Nos. 36 at 13; 36-14 at 28. She also relies on allegations that DU tolerated Fogle and Mathewson's negative treatment of Hiatt, even though Hiatt complained about it "repeatedly." ECF No. 36 at 13.

The Court concludes that Hiatt has not met her burden to offer evidence that shows a genuine dispute over whether she is similarly situated to Fogle and Mathewson. In considering whether employees are similarly situated, a "court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *McGowan*, 472 F.3d at 745 (internal citation omitted). Hiatt's focus on Palmateer's supervision of all three obscures the reality that the three women had materially different work histories and roles at HCC. Hiatt was formerly employed by DU as a Staff Psychologist/Training Director and then later as a Staff Psychologist/Outreach Coordinator. *See* ECF No. 33 at ¶¶ 1, 25. In contrast, Fogle was in a post-doc role at HCC, and Mathewson was a pre-doctoral intern at HCC. *Id.* at ¶ 7. Additionally, Hiatt ignores the reality that she had supervised both Fogle and Mathewson. *Id.* Therefore, despite the fact that the APA

ethical standards apply to all three women, and Palmateer supervised them, Hiatt does not offer evidence from which a reasonable jury could conclude that Fogle and Mathewson were similarly situated in all relevant respects.

Additionally, even similarly-situated employees "must have been disciplined for conduct of comparable seriousness in order for their disparate treatment to be relevant." *McGowan*, 472 F.3d at 745 (internal quotations and citation omitted). Critically, Hiatt's claim that DU permitted Fogle and Mathewson to treat Hiatt poorly does not demonstrate that they were treated more favorably because it is not of "comparable seriousness" to the conduct for which Hiatt claims she was disciplined.

The Court is sympathetic toward Hiatt's belief that defendants treated her unfavorably, but "the applicable standard is one of relative—and not absolute—disfavor." *Toure v. United Nat. Foods*, No. 12–cv–02790–RM–KLM, 2014 WL 2442962, at *9 (D. Colo. May 30, 2014) (internal quotation marks omitted). Therefore, without evidence that defendants treated her unfavorably compared to similarly-situated employees, the Court cannot conclude that Hiatt has created a triable issue of fact regarding whether she received disparate treatment. *See id.*

### b. Claims Two and Four – Retaliation in Violation of Title VII and Title IX.

Title VII prohibits an employer's retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The Tenth Circuit has held that "[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

"A meritorious retaliation claim will stand even if the underlying discrimination claim fails." *Sanchez v. Denver Public Schools*, 164 F.3d 527, 533 (10th Cir. 1998).

Like with a Title VII discrimination claim, a plaintiff can rely on direct evidence or demonstrate retaliation circumstantially through the three-part *McDonnell Douglas* framework. *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987 (10th Cir. 2011). To state a prima facie case for retaliation, a plaintiff must demonstrate "(1) that [she] engaged in protected activity, (2) that [she] was subject to an adverse employment action, and (3) that a causal connection existed between [her] protected activity and the subsequent adverse action."[3] *Cross v. The Home Depot*, 390 F.3d 1283, 1286 (10th Cir. 2004) (internal citations omitted). "If Hiatt can show a prima facie case, the burden shifts to defendants to provide a legitimate, non-discriminatory reason for its employment action. Finally, if defendants can satisfy their burden, Hiatt then bears the burden to show that there is a genuine dispute as to whether defendants' proffered reason is pretextual. *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1267 (10th Cir. 2004).

Hiatt does not present direct evidence of retaliation, so the Court will analyze her retaliation claim under the *McDonnell Douglas* framework. *See Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004). Hiatt claims that DU retaliated against her after she engaged in protected activity. *See* ECF No. 36 at 14–16. Defendants move for summary judgment on the grounds that Hiatt's retaliation claim fails as a matter of law because her "complaints were not based on an objectively reasonable belief that she was discriminated against on the basis of sex[,]" and she does not offer evidence that "DU took any adverse action against her" or that "her complaints were the but-for cause of the alleged adverse actions." ECF No. 33 at 12–15.

---

[3] The same framework applies to retaliation claims under Title IX. *See C.T. v. Liberal Sch. Dist.*, 562 F.Supp.2d 1324, 1336 (D. Kan. 2008).

Assuming that Hiatt could satisfy the prima facie case for retaliation,[4] the burden shifts to the defendants to offer a legitimate, non-discriminatory reason for the alleged retaliatory actions. This is "a burden of production and can involve no credibility assessment." *Fye v. Oklahoma Corp. Com'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (internal quotations and citation omitted). Defendants contend that they generally took all of the alleged actions because Hiatt's conduct had "raised serious questions about her judgment and boundaries" and because many of her supervisees did not want to continue in a supervisory role. ECF No. 33 at 11. Defendants also state that "it became increasingly clear that Hiatt could not continue in her supervisory/trainer role because of her lack of boundaries and poor judgment." ECF No. 42 at 3. Additionally, defendants maintain that they held Hiatt to the same performance standards as other HCC staff members. *Id.* at 4. The Court finds these to be legitimate, non-discriminatory explanations for the alleged behaviors and actions. Therefore, the burden shifts back to Hiatt to show that there is a genuine dispute as to whether defendants' proffered reasons are pretext. The Court finds that plaintiff fails to carry this final burden.

To demonstrate pretext, Hiatt "must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory

---

[4] The Court notes that many of Hiatt's allegations of retaliatory conduct, *see* ECF No.36 at 16, seem to be "trivial harms." *See Somoza v. University of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008); s*ee also Burlington Northern*, 548 U.S. at 68 ("We speak of material adversity because we believe it is important to separate significant from trivial harms."). Additionally, it appears that Hiatt fails to create a triable issue of fact regarding whether her resignation constitutes constructive discharge because she does not offer objective evidence that she had "no other choice but to quit." *Sanchez*, 164 F.3d at 534 (internal quotations and citation omitted) (emphasis removed); *see also* ECF No. 36 at 14.

reasons." *Fye*, 516 F.3d at 1228–29 (internal citation omitted).  For the purposes of her retaliation claim, Hiatt incorporates her evidence of pretext from her discussion of her discrimination claim.  ECF No. 36 at 14.  She alleges that defendants' explanation is "not worthy of belief." *Id.* at 11.  However, she does not proceed to genuinely cast doubt on defendants' explanations for the retaliatory conduct.

First, she argues that DU had no "legitimate basis" when it "demoted" Hiatt. *Id.*  She argues that DU "concluded that Hiatt's conduct was unethical," and she maintains that her relationship with Coven was not "a prohibited multiple relationship." *Id.*  However, this argument does not go beyond indicating a mere disagreement with defendants' proffered reason for encouraging her to take the Outreach Coordinator position, and Hiatt fails to show specific implausibilities in defendants' explanation that they were concerned about Hiatt's "lack of boundaries and poor judgment."  She claims that defendants only offered her the new role when they could not "establish that Hiatt and Coven dated during supervision." *Id.* at 12.  However, she does not offer specific evidence to support this speculative claim as Kent only concluded that Hiatt's conduct fell in an ethical grey area, and there is no evidence to suggest that defendants would have taken a different course had they had firm evidence that Hiatt and Coven began dating during the supervisory relationship or that Hiatt's conduct was unethical.

Additionally, Hiatt also alleges that "DU used subjective standards to withhold Hiatt's supervision duties." *Id.*  However, the fact that Asher recommended that Hiatt could resume supervision does not demonstrate pretext, as defendants could reasonably disagree with Asher's assessment.  Finally, Hiatt claims that "DU held Hiatt to a different standard than other HCC staff."  She concludes that DU's differential treatment of her "shows pretext." *Id.* at 13.  The

20

Court finds this statement to be conclusory, and that it does not show a specific inconsistency in defendants' explanation that they had lost trust in her judgment and work as a supervisor.

In sum, the Court determines that Hiatt fails to carry her final burden of establishing a triable issue of fact as to whether defendants' explanation for the alleged retaliation is pretext. Therefore, the Court grants summary judgment as to plaintiff's Title VII and Title IX retaliation claims.

### a. Plaintiff's Remaining Claims.

The rest of plaintiff's claims are state law claims. In light of this Court's order, there is no longer any federal question. No alternative basis for federal jurisdiction exists, as the parties are not diverse. Therefore, the Court declines to exercise supplemental jurisdiction over Hiatt's state law claims. *See* 28 U.S.C. § 1367(c)(3).

### III.    Defendants' Motion to Strike.

Defendants move to strike a number of the affidavit statements that Hiatt proffers. ECF No. 41 at 1. Defendants claim that the affiants in question do not have personal knowledge of that which they discuss, and that the affidavits contain "numerous conclusory statements of belief and inadmissible hearsay[.]" *Id.* at 2. Because the Court grants defendants' motion for summary judgment, the motion to strike is moot.

### ORDER

For the reasons stated above, defendants' motion for summary judgment [ECF No. 33] is GRANTED as to the federal claims—Claims One, Two, Three, and Four. As to those claims, final judgment enters for defendants Colorado Seminary, Alan Kent, and Jacaranda Palmateer and against plaintiff Tawny Hiatt. The Court declines to exercise supplemental jurisdiction over

the remaining state law claims and dismisses them without prejudice.  Defendants' motion to strike affidavit statements [ECF No. 41] is DENIED as MOOT.

DATED this 5th day of April, 2016.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge